This matter is RBS Citizens versus, I'm sorry, it's RBS Citizens versus Alex Weindy. Good morning, Your Honours, and may it please the Court, my name is Kim Watterson and I'm here for Citizens Bank, captioned as RBS Citizens, and my colleague, Christina Tolado, is with me at Council Table, and I would like to reserve three minutes for rebuttal. This Court should reverse the class certification order because the evidence in this case, which we carefully examine in our brief, doesn't permit the type of common findings that Supreme Court precedent requires. And plaintiffs have, and I will probably repeat this several times during my argument, the burden to establish with significant proof that there are common questions that can yield common answers. To show that in a single stroke, each member of the class could prove their own individual claims based on the representative evidence. Well, the individual claims, you'd agree that even if some of the individual claims wasn't only fail on the merits, even if a decent number, I won't say a significant number, but a decent number of them fell on the merits, that wouldn't be sufficient to defeat class certification by itself. You'd agree with that? Your Honour, that may be, but the question... Because yes, you do agree with that. I agree that that alone, in certain cases, but that's not the case here. We need to go back to what Wal-Mart versus Dukes says. When a class is attempting to prove that class certification is appropriate, through an assertion that there is a common policy implemented commonly, the plaintiffs need to provide significant proof of a common policy. This sample evidence, which we go through in great detail, shows such wide variations that there is no sense in which... I mean, some of the evidence may demonstrate a claim exists. Some may demonstrate a claim doesn't exist. But when it comes to the basic and foundational questions, whether overtime was worked off the clock, whether it was worked off the clock because of a common policy, whether individual managers knew about work taking place off the clock and suffered or permitted it, there is simply no significant proof, convincing proof, of a common policy. What if they could show that all of the MLOs were incredibly reluctant to put any kind of overtime in? Some of them were reluctant because they had been specifically told by the supervisor, I'm not authorizing it. Others were reluctant because they had the sense that their fees over the company promotions and those kinds of things was impacted if they put in overtime. There may not be any specific way of enforcing... It's kind of like the Rios case, not the deposit. There may not be any specific way of enforcing... There may not be even any specific individualized policy in terms of how it's applied. But could the fact finder extrapolate from all the evidence that it's clear that this company was a policy of not paying for overtime? Your Honor, this evidence doesn't permit that finding. It's detailed in the brief, and I won't go through with numbers and bore everybody and the students here. But we have a substantial number of, and detailed on our brief, I think pages 16 to 33, MLOs who were deposed who said they never received an instruction that they shouldn't report overtime. They were actually told, report overtime and you will be paid even if you don't get permission. Of the 25 MLOs that the special master highlighted in his report, I believe it was 14 out of 25 reported overtime. Mr. Richards, an opt-in who provided interrogatories but not a deposition, said, yeah, he worked overtime all the time and he did it with his manager and his manager said he could report it. I'm highlighting this, Your Honor, Judge McKee, not to say, oh, these are a bunch of individual claims that fail, but to say, does it answer a question, does it look like Tyson Foods as opposed to Duke's? There, for instance, in Tyson Foods, every employee who went to the packing plant for Tyson Foods had to don and doff every day. No doubt about it, everybody donned and doffed. There was a policy that said we do not pay for donning and doffing. Therefore, there was a policy and the existence of the policy established in a single stroke the claim of each class member based on that proof. How does this case differ from the Seventh Circuit decision in Bell v. PNC? It differs from Bell v. PNC in multiple ways, Your Honor. And if the court finds it doesn't, I would submit that the Seventh Circuit got it wrong. In that case, and I am going to look at my notes on purpose, I often don't do that. The court in Bell found that there was plentiful evidence of, and I'm underscoring, a company-wide policy. And how did they prove the existence of a company-wide policy? There was a branch manager who said the bank regularly required off-the-clock work. And that a regional manager told branch managers not to record overtime because PNC had a policy against paying for overtime. Unambiguous statements from high-level managers. Second, and there are three differences, the court found that the employees had common experiences. A number of people making the same allegations across branches, managers, positions, and time frames. Not here. We even have Ms. Fiorella and Fragel saying that their manager, Schwartz, told them different things. What about the common memo? Pardon me, sir? What about the common memo that he said he was a regional manager, but he said he was a region? Doesn't that come close to the Bell situation? No, because I think if we look at the email, and I'm glad you brought that up, Your Honor, and I reread all of the email again last night to make sure I was going to make a fair comment. And let me point out, there were thousands of emails produced, and only a handful of emails that Plank has pointed to. A reading of those emails, and you'll notice in many of them, and it may be the Coon, I may stand corrected on that, we actually have managers ultimately in those memos approving overtime or paying for overtime. Those memos reflect managers doing what they're supposed to be doing, and that is telling people that they need to seek preapproval. Also, pointing out in many instances, someone is putting in an awful lot of overtime but low productivity, like an associate putting in lots of time and not producing very much work. Asking and making an inquiry, you seem to be billing nine hours every day. Is that because you're billing for the lunch hour, or are you working at lunch? And if you're working at lunch, ask for preapproval for that overtime. A look at both the email is not evidence of a company-wide policy, the same in Bell, and when you look at the MLO experiences, we do not have the common experiences. Is there a standing issue under the B-2 class? And did all the plaintiffs are former employees? Yes, Your Honor, and that's what we point out. There's a problem with the fact that the court didn't define the class claims, and one of the ones that we pointed out most notably is that the court has certified, or seemingly certified, or we don't know whether the court has certified an injunctive relief class, and they're all former employees. But then again, that could be dealt with by just that subclass. There's so many subclasses here, but that could be dealt with either by a remand with instructions to better define the class. Your Honor, that's not going to... Taking the injunction away, I agree that's a problem. But that's not going to solve the foundational problem that there is no commonality even across the subclasses. First of all, plaintiff is asked basically for a nationwide class in ten subclasses representing different states because they're state law claims. But plaintiff is not offered, and I will say this record doesn't show, hypothetically I'll pick my home state of Pennsylvania, that we have, for instance, mortgage loan officers in Pennsylvania who all are operating under a common policy implemented in that region. There is no commonality on this record. Well, what about this pen and appellate jurisdiction argument that you're making in that the FLSA is radically different in many respects than the Rule 23? Rule 23 allows you to take an interlocutory appeal. The FLSA doesn't, and there are many other differences. So you're losing me on this pen and appellate jurisdiction issue. Your Honor, I'll begin at the beginning. Pen and appellate jurisdiction, I know you know, applies when this court properly has jurisdiction, which it does given the grant of the Rule 23 Act. On the Rule 23. Right, but then pen and appellate jurisdiction, and this court's precedents in Electnikoff, CTS, say that if there is an order or a ruling that isn't otherwise within this court's jurisdiction through 23-F or whatever, either an injunction, for instance, that's immediately appealable, that if this other ruling is so inextricably intertwined with, overlapping with the ruling, and here, Your Honor, I will say that these fatal dissimilarities and variations in the class which defeat Rule 23 commonality equally defeat the similarly... The two-step process under FLSA. What's your position? FLSA, we've already had the conditional certification. Now we are seeking decertification of the FLSA class. Your answer now is the exact same analysis. Because at the second stage of the FLSA certification process, when typically there's been a conditional certification and the defendant is seeking decertification, the plaintiff has an evidentiary burden at both places. And I'm going to read from a case similarly situated. Single FLSA violating policy, when proof of that policy or conduct in conformity with that policy proves a violation as to all plaintiffs, sounds to me an awful lot like or similarly enough to the single-stroke language out of Walmart. So if this court, for instance, agreed with me that there was no commonality under Walmart and Tyson Foods and reversed the class certification... What if we remanded it? Pardon me? What if we remanded it? I guess, Your Honor, that would depend upon why it was remanded. But I think it would still good for goose, good for gander when it comes to FLSA. And the same problems in the evidence that defeat commonality also defeat a finding at the second stage where proof is required of substantial similarity. Plaintiffs have tried both their FLSA claims and their state law claims based on the same theory, based on the same proof. Their certification theories are the same. Common policy implemented throughout the bank. Do you agree that it's easier to get class certification under the FLSA than it is under Rule 23? Your Honor, I don't know if I would completely agree with that. I don't want to fight the premise that in certain circumstances it might be easier. But in this case, it is the same. I can't find any material difference between the notion that we have to have... Again, when a plaintiff's FLSA and Rule 23 theory on state law claims turn on the existence of a common policy and that one representative class member's evidence can prove the evidence of everyone else. It's not like Dyson Foods, as I've explained. That notion of whether they're similarly situated so you can prove a violation for all plaintiffs with the representative evidence, I don't see any distinction between that and common question, common answer, so that you can decide in one stroke the claims of all class members based upon the representative evidence. But you didn't approve class certification of the district court, did you? Pardon me, sir? I thought you did not challenge the certification of the district court. You took a deal from the master. But in the master's report, the first report, states that you didn't oppose class certification. Did I misread that? I think you did, Your Honor. Once we had the conditional certification in the FLSA, then there were the opt-ins, and then the discovery process starts and the plaintiff is put to the burden both for FLSA, final certification, Stage 2, and class certification in the first instance. Then plaintiffs move for class certification under 23. We opposed that, and we also moved to decertify, which is what you do at the second stage of an FLSA case after the discovery period. Are you familiar with the Supreme Court's Genesis Health Care opinion? Pardon me? Are you familiar with the U.S. Supreme Court's Genesis Health Care opinion, where they cautioned lower courts not to treat these two different sorts of vehicles the same? Your Honor, I don't know if I can respond to that to you in a granular or detailed way, other than to... In a broad brush. ...other than to return to my view that when we talk about the ancillary and pendent jurisdiction precedents in this court and looking for, are the claims intertwined, is there an overlapping? I think about, I think it's an electnicoff or perhaps CTS, and one of those two that I cite in my brief. There was an injunction granted, and we know you can immediately appeal and order granting an injunction. But at root, at bottom, core to the decision on whether there was an injunction had something to deal with the question of whether summary judgment was appropriate and viability of the underlying claims. So that a decision that X means that their injunction shouldn't have been entered also conclusively deals with the summary judgment issue. Same goes here. I am not saying, Your Honor, that in every case where there's a rule, and this is not the ruling I'm asking this court for, that in every case where there's a rule 23F granted, and there happens to be an FLSA claim in the case, that this court should exercise ancillary or pendent jurisdiction over the FLSA issues. I'm invoking instead this court's definition of circumstances where it's appropriate when there is an overlap. And in terms of legal theories underlying both, in terms of the defects that warrant reversal of the class certification order, in this case, based on this evidence and these, the plaintiff's theories of recovery under the state law claims and the FLSA claims, what defeats one equally defeats the other. Thank you very much, Your Honor. We'll have you back in rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the court, my name is Josh Boyad. I represent the plaintiffs in this matter. Citizens Bank, in this case, is asking this court to overturn 72 years of precedent that allows representative evidence to establish wage and hour violations and wage and hour damages. They're asking this court to overturn the essential holding in Anderson. They're asking this court to overturn the Supreme Court's upholding of Anderson and Tyson two years ago. They're asking this court to reject the Third Circuit's holdings in Gateway Press and Stalker Brothers. They do this, though. Ms. Morrison doesn't read any of those cases the way you do. Why is it that her reading of those cases is wrong? Her reading of those cases is wrong because it is an abuse of discretion standard to review this issue of similarly situated and whether or not there's a common policy and whether or not our evidence can be used to infer that there wasn't a common policy. Under Marcus, we assess predominance. Are you familiar with any scenario where a district court didn't do a certification, just adopted the recommendation in whole? You ever seen that before? I can't cite to a case, but I believe in my review I did see an adoption of a special master's. How is that consistent with our requirement of a rigorous analysis of the proof? Well, Judge Schwab, in his order, said that he did an independent review of the evidence. Well, he said that, and then he said, I'm going to go with what this guy said. And he provided a basis. He said that the job duties are similar. He said that the claims are similar. He said that... How is the policy communicated to the members of the class? The policy is communicated to the members of the class through regional managers, who are the managers of managers. They're two steps away from the president, and through the district managers. About the evidence in, she said 16, I think it was page 15 in the brief from the appellants, where they specifically lay out individuals that would be inconsistent with what you're saying. You know, we took a small subset of MLOs, and we looked at their experiences, and the differences between those testimonies are far different, are far less material than the similarity. There's a suggestion that your folks didn't show up at depositions. What happened there? You know, defendants and plaintiffs... There were seven people that didn't show up. What happened? There were nine people who didn't show up. Half of them were the ones they selected, and half were randomly selected. Some had surgeries. Some were not available during the one month that they decided to take depositions. Defendants were trying to take 25 depositions in 24 work days. The question is, why didn't your people show up? That's a pretty simple question. Two had surgeries, were not available during the discovery period, would be available at trial. They can be subpoenaed. Two wouldn't talk to us. Three decided to opt out. Two clients wouldn't talk to you? They refused to talk to us. There may be a discovery sanction that is opposed to them, but that does not suggest because, you know, in these cases, it is very common that not everyone participates in discovery. Does that go to the adequacy and superiority of representation? In Rule 23, if you've got clients who won't even talk to their attorneys and we have to determine whether or not the court aided in finding the class vehicle as superior because of the ability of common representation? You know, I think our firm did everything that we could do to communicate with these individuals in a very short discovery period that was caused by defendants' delays. And that is in the record, and we presented those issues to the court, and the court made a judgment that the court could have made a different judgment. The court could have said, let's depose these individuals. But, you know, this goes to the nature of this interlocutory appeal. Well, Rebecca, if two had surgery and two wouldn't talk to you, what happened to the others? You want all nine or the five? Yeah. Two had surgery. Three wanted to remove, so that's five. One was not available during that month but would have been available in the next month. One said she would come and then didn't. I'm not sure if that's nine or seven, but it's all five of the ones that they said we didn't show up. We provided an interrogatory response from Mark Richards, and, you know, this was a rushed discovery process because of what defendants did. And they made a motion to try to get additional discovery, but they lost that motion because of their own misconduct. And they could have brought their managers. They could have had affidavits from their managers. We know what those individuals were doing. We have their records. We know that they recorded overtime. Did they record a lot of overtime? No. Which goes to this strawman argument that defendants keep making is there was a lot of overtime recorded. A, there was not a lot of overtime recorded. But, B, the policy was not you're not allowed to record overtime. The policy is you're not allowed to record more than five hours of overtime. Now, that policy came out in two different ways. Many of the MLOs were told you're not allowed to record any overtime. Some of the MLOs, the ones who pushed, were. How were they told that? They were told you have to get overtime pre-approved. What to put on your time sheet is 40 hours. If you ask for overtime, we're not going to approve it. You took that in person or via memos? It was mostly oral representations, but we've seen some e-mails that are consistent with that. We have an e-mail from Nancy Mon-Bupette telling someone who recorded overtime without pre-approval, someone who violated their off-the-clock policy, don't record that. MLOs are not eligible for overtime. And they'll say, well, no, just he was not eligible for overtime. But a jury could infer that that instruction from the regional manager of the entire New England area, she was essentially an acting division manager telling MLOs that they're not eligible for overtime during this period. They can infer that what she's saying in an e-mail, she is saying orally. Andrew McNally is an incentive analyst. And Andrew McNally does not appear a single time in their opening brief, and I don't believe in their reply brief. He's the man behind the curtain. She is the central glue that provides the commonality that shows there was this common policy. Because what Andrew McNally would do is, and he's in the incentives department, he's not in HR, he would look at all the time records that were being submitted every week. And if he saw more than five hours of overtime, he would send an e-mail not to the line manager, who then might exercise some discretion. No, he would send it to the division manager. And there's only two or three of those at the entire company. At one point there's three, and then there's two. He would send that e-mail to the division manager and the regional manager, and the two of them would figure out what was happening. And so we see that. We see this e-mail from John Krause. We see an individual who reported six hours of overtime one week and then ten hours of overtime the next three weeks. And he says, this is significant overtime. And that e-mail is at appendix 1534. And also they had approved like three applications during that period of time. Right. So ten hours of overtime? Yeah. So John Krause, he says, well, first, the division manager says, what's happening? Who is approving this? Who has been approving your time sheet? Bruce Occo says. John Krause says, not me. And then he shows why there's overtime in this record. John Krause says, I had approved some incidental overtime one to three hours, which is consistent with all the evidence, which is one to three hours was approved if people asked for it to some people. Not everybody, but some people. But he said, but this is something different. This is unacceptable. And he says, you know what? I'm sorry. I did not have an OT philosophy talk with the new manager. He was probably happily pushing the button not knowing any better. And so then he goes in, and he has this OT philosophy talk, which a jury can infer is the same OT philosophy talk that every regional manager is giving their PSMs, which is you can only record overtime over five hours if you're at the highest tier of production. And there's substantial evidence in the record that, you know, production is not a good metric for work because when production is low, they have to network, they have to hustle, they have to go call referral networks. I ask because, you know, one question is, well, if production varies across the year, how are you accepting all these 40-hour weeks, you know, over and over again? Isn't that an inference? And what the defendant said was, these managers, they said, no. If you have less production, you have to do more work to get production. So, and he says. Let me ask you a B2 class. Yeah. I'm a little confused as to standing with everybody. You identify your amended complaints as a former employee. So, you know, the case all we read, and admittedly it's older, is that standing is at the time of the complaint. How do you complain? Everybody's a former employee. Well, when the complaint was filed, Bob Soder was a current employee. In your amended complaint, right, this is the operative document here. It starts at page 8 and goes through page 9. Everybody listed, literally everybody is a former employee. Answer that question. At the time of the amended complaint, everyone is a former employee. And this is the operative document. So, how do you have standing? Well, first of all, we certainly have standing for retroactive injunctions and declaratory relief. How do you have a retroactive injunction? You can have a declaratory statement that the policy was illegal. That has some value to these people, that they were not lying. That's what you want? You want a statement saying, my bad? Well, once you have that declaration, I mean, you can't divide that between the former employees and the current employees. So that's one reason a B2 class is appropriate. Another is it's been certified, and once it's been certified, we can replace the named plaintiff. And I would say, if you find that there is a mootness issue, I would argue that this is an order-standing issue. It's been certified with a bunch of former employees. The Supreme Court said in Dukes, plaintiffs no longer employed lack standing to seek conjunctive relief. We have many people who have opted into this lawsuit who are current employees who have provided testimony. You haven't asked about that now. You haven't asked about the former employees. You're still waiting for an answer for that. So I would say, you know, I think because the declaratory relief that we're being asked for is the same a former employee can stand in. And defendants didn't make this standing argument, and they didn't make it until they objected to the special master's report. It doesn't matter when they make it, even if they make it at all. Well, so I would argue that the results should be remanded, and we should have the opportunity to submit a new named plaintiff who's a current employee. How did the district court define the class? The district court defined the class as all the subclasses as defined by the special master. How did the special master define the class? The special master defined the class as within a certain period of time, three years from the back. Well, not three years. Actually, each state has a different statute of limitations. So each state, going back in their statute of limitations from the, I believe, the amended complaint, but it may have been the original complaint, the wage and hour claims, every MLO who worked within that state during those periods. I couldn't find a definition other than I'd have to go back to an amended complaint and read a bunch of paragraphs. No, I'm sorry. So the special master, and this goes to Judge McKee's confusion about the certification. They agreed that a Rule 23 class should be certified as to our recapture claims, that they had a payroll issue, and in that special master report, the special master defined the classes with a chart that showed the statutes of limitations in each class. And in the second report, which dealt with certification of the off-the-clock policy claims, he incorporated by reference, I believe, to the page numbers that discussion from his first report. So the definitions in the first report is included by reference in the second report. It's not, we don't think it's a confusing class. It's every MLO who worked there in each state during the statutes of limitations for that state. And that is, it's in the first report in detail. There was a typo in our motion, and the special master corrected that, which the court is allowed to do. The court can redefine a class if there's an error, and that's in there. So we, you know, we, and all the claims are certified. So all claims are certified. No part is uncertified at this point. We have, you know, the trial court was going to trifurcate or bifurcate the proceedings. So, you know, that's, but all parts of those proceedings were certified. What about the FSA class? Yeah. In pendant jurisdiction. You know, pendant jurisdiction is appropriate when the two claims are inextricable. Inextricable means you can't decide one without the other. I don't know a lot of big words, but that's what I happen to know. You know what it means. Well, I think the definition is important because it means can you decide one without the other. And here you can decide Rule 23 without, you have to decide Rule 23 separate from deciding FLSA. Under Zavala, it's a different standard. Under Genesis, they're not the same. So you're saying if we were to find that there's insufficient evidence of commonality here, that would not defeat the certification of the FSA claim? I don't think it would. They haven't explained why it would fail under Zavala. Zavala said one issue that goes to FLSA certification is if there's a single policy that, you know, resolves everything. We think there's lots of single policies that have an impact on, you know, on them working off the clock. There's the block reporting, the fact that they allowed all these individuals to submit fictitious time records without reviewing the timesheets. There's this Andrew McNally cutting down on five. You know, so we think there's different steps to this policy, and actually the varieties in the testimony gives us an opportunity to see exactly how that policy worked. If you didn't have those varieties in the record, you wouldn't know. They would say, well, what about these people who recorded three hours of overtime? Doesn't that mean there's no policy? No, because we talked to them and we said, oh, they too said that they were not allowed to work their real overtime hours worked. They were just allowed to work three. We can see that it's all coming from this, you know, this Andrew McNally sending these emails from – there's a meeting. Charlotte Pemberton, there's an email that says we're going to have a meeting with the entire management staff where we're going to show all the MLOs who are working more than five hours in red, and that happens in 2013 at the beginning of this period. How many would that be? MLOs? In that category. Yeah, all the MLOs or all the managers. MLOs. There was – I believe in 2013 it was around 350, and it has increased around 500 by the end of the class period. And the class period is continuing. So my time is up, and I thank you for your hearings. Okay, thank you. Thank you. I'd like to make three points, maybe four, to respond to some of the things my friend over here said and as well as this court's questions. First of all – You have a lot of friends like this? Yeah, they really are. I'm not going to repeat at length, but Duke says the weather – you can't frame whether a common policy exists as the common question. The court said you must have significant proof of a common policy, commonly implemented, if that's your theory. I keep talking about pages 16 through 33 of my brief. It will be there. But, you know, they say there's this common policy, and it's commonly implemented, and everybody knows. There's at least seven or eight of the 18 depositions that we review where MLOs said – and then add Richards to this with his interrogatory – no one ever instructed me not to book overtime. They told me to book all my hours. I was told that I would get paid. You get paid even if there isn't pre-approval. The Coon Memo, for instance, tying into this, what he's talking about when asked about his protocol is you're supposed to log all your hours worked. This is 1549. You should reach out and get pre-approval. But even if you don't get pre-approval, you need to log your hours. So the bottom line is these variations defeat any possibility that we can go to trial and put on this evidence and come to a conclusion that there has been a common policy, implemented commonly, impacting everyone commonly, that you could prove – let's pull Jane's name out of the hat – and you could prove Jane's claim with Reining's evidence or Soda's evidence or Richards' evidence. It's not like Tyson Foods. It's like Duke's. There may be a manager here or there that wielded his individual discretion and put the hammer down and told his people you'd better not be working overtime. That is not a uniform policy commonly implemented across all of the class. I'd also like to point out citizens really did, and this is a relevant factor, they paid a lot of overtime over the class period. 60,000 hours, in sight to the portions of the record in the brief, paying almost $3.2 million. The five, Your Honor, who they didn't produce, plus the other four, are selected, plus randomly selected. Nine folks, and we detail the numbers in our brief. These are people making a lot of money, producing a lot of loans, and booking a lot of overtime and getting paid overtime. So to sum up with the two sections of seconds I have left, Duke says it's not enough to say whether a common policy exists is a common question. You have to have significant proof that a common policy exists when your class theory and liability theory turns on that. This record and the variations in the record demonstrate that that cannot be done. And I would ask this Court to reverse the class certification order with respect to liability and damages. We talk about damages in our brief. And I think this falls squarely within the type of circumstances where this Court may and should exercise its ancillary or pendant jurisdiction to decide the FLSA decertification issue, because what defeats commonality equally defeats similarly situated on this record.